Barry I. Levy, Esq.
Michael Vanunu, Esq.
Joanna Rosenblatt, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and
GEICO CASUALTY COMPANY,

                              Plaintiffs,

              -against-

ADVANCED MEDICAL SUPPLIES, INC., FATIMA
ELKHETTAB, and JOHN DOE DEFENDANTS
"1" through "10",

                         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.: _____(     )

**Plaintiffs Demand a**
**Trial by Jury**

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs") as and for their Complaint against Defendants Advanced Medical Supplies Inc.

("Advanced Med Supplies"), Fatima Elkhettab ("Elkhettab"), and John Doe Defendants "1"

through "10" (the "John Doe Defendants") (collectively, "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.      GEICO brings this action to recover more than $600,000.00 that Defendants have

wrongfully obtained from GEICO by submitting and causing to be submitted hundreds of fraudulent no-fault insurance charges related to medically unnecessary, illusory, and otherwise non-reimbursable durable medical equipment ("DME") and orthotic devices ("OD") (e.g. cervical traction equipment, lumbar sacral supports ("LSO"), exercise equipment, shoulder and knee orthoses, etc.) (collectively, the "Fraudulent Equipment") to individuals involved in automobile accidents in a systematic, predetermined fashion, without regard for genuine patient care. The Fraudulent Equipment is alleged have been provided by Advanced Med Supplies and Elkhettab (collectively, the "DME Defendants") to individuals who claimed to have been involved in automobile accidents in New York and were eligible for coverage under no-fault insurance policies issued by GEICO ("Insureds").

2.     DME Defendants, in conjunction with others not presently identifiable to GEICO, devised a fraudulent scheme that involved obtaining prescriptions for medically unnecessary DME/OD from purported healthcare providers (the "Referring Providers") who were working out of No-Fault clinics in the New York metropolitan area through the payment of kickbacks and other financial incentives, and using the prescriptions for the medically unnecessary DME/OD to submit billing to GEICO and the New York automobile industry containing numerous fraudulent representations concerning the Fraudulent Equipment allegedly provided to Insureds. Through the fraudulent scheme, DME Defendants billed GEICO alone more than $2.3 million.

3.     By this action, GEICO seeks to recover more than $600,000.00 that has been wrongfully obtained by the DME Defendants, and further seeks a declaration that it is not legally obligated to pay reimbursement of more than $700,000.00 in pending no-fault insurance claims that have been submitted through Advanced Med Supplies because:

(i)     DME Defendants billed GEICO for Fraudulent Equipment pursuant to a fraudulent scheme that was designed and implemented to exploit the

2

patients for financial gain so as to benefit the DME Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care, and which included dispensing Fraudulent Equipment that was not medically necessary and which was prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements, and were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures;

(ii)    DME Defendants billed GEICO for Fraudulent Equipment that was provided – to the extent actually provided – as a result of decisions that were made by laypersons, not based upon prescriptions issued by the Referring Providers who are licensed to issue such prescriptions; and

(iii)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for the Fraudulent Equipment submitted to GEICO by the DME Defendants fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds and misrepresented the permissible reimbursement rate for the Fraudulent Equipment.

4.    The Defendants fall into the following categories:

(i)    Defendant Advanced Med Supplies is a Nevada corporation, authorized to do business in New York, that is used as the billing arm of the fraudulent scheme – it purports to provide Fraudulent Equipment to persons who were allegedly injured in motor vehicle accidents, and bills New York automobile insurance companies, including GEICO.

(ii)    Defendant Elkhettab is one of the primary drivers of the fraudulent scheme – she owns, operates, and controls Advanced Med Supplies and uses it to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims.

(iii)    The John Doe Defendants are the other individuals involved in the fraudulent scheme – while they are not presently identifiable, they have associated and colluded with DME Defendants to further drive and financially benefit from the fraudulent scheme committed against GEICO and other New York automobile insurers through their associations with the Referring Providers and control of various medical offices that purportedly treat a high-volume of No-Fault insurance patients (the "Clinics").

5.    As discussed below, the DME Defendants at all times have known that the claims for Fraudulent Equipment submitted to GEICO were fraudulent because:

(i)    The billing submitted to GEICO and other New York automobile insurers

was pursuant to a fraudulent scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the DME Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care, and which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements, and were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures;

(ii)   The Fraudulent Equipment was provided – to the extent any was provided – as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions; and

(iii)  To the extent that any Fraudulent Equipment was provided to Insureds, the bills for the Fraudulent Equipment submitted to GEICO by the DME Defendants fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds and misrepresented the permissible reimbursement rate for the Fraudulent Equipment.

6.     As such, the DME Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through Advanced Med Supplies.

7.     The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date that the DME Defendants submitted, or caused to be submitted, to GEICO under the name of Advanced Med Supplies.

8.     Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry began no later than 2021 and has continued uninterrupted through the present day, as the DME Defendants continue to seek collection on pending charges for the Fraudulent Services.

9.     As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $600,000.00.

# THE PARTIES

## I.    Plaintiffs

10.    Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland.  GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

## II.    Defendants

11.    Defendant Advanced Med Supplies is a Nevada Corporation that was licensed to do business in New York State on or about May 15, 2014. Advanced Med Supplies has its principal place of business in Santa Ana, California. At all times, Advanced Med Supplies was owned and operated by Elkhettab and used by as a vehicle to submit fraudulent no-fault billing to GEICO and other New York automobile insurers.

12.    Defendant Elkhettab resides in and is a citizen of California and owns and operates Advanced Med Supplies. Elkhettab, at all relevant times, has been one of the primary drivers of the fraudulent scheme, owns, operates, and controls Advanced Med Supplies, has associated with others not presently identifiable to obtain the illegitimate prescriptions from the Referring Providers and used those prescriptions to submit bills to GEICO and other New York automobile insurance companies for the Fraudulent Equipment.

13.    At all relevant times, Elkhettab and Advanced Med Supplies have transacted business within New York, regularly done business in New York, engaged in a persistent course of conduct in New York, and derived substantial revenue from the dispensing of the Fraudulent Equipment in New York, including renting a post office box from Manhattan Mailboxes located

at 302 W 12th St, New York, NY 10014.

14.    Elkhettab is not and has never been a licensed healthcare provider and entered into unlawful arrangements with the John Doe Defendants in exchange for referrals to Advanced Med Supplies for the Fraudulent Equipment.

15.    Upon information and belief, the John Doe Defendants are citizens of New York and include individuals who are not presently identifiable but (i) are associated with the Clinics, (ii) are unlicensed individuals who unlawfully own and control the Clinics and the relationships with the Referring Providers, and (iii) have conspired with Advanced Med Supplies and Elkhettab to further the fraudulent scheme committed against GEICO and other New York automobile insurers for their own economic benefit.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

17.    Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

18.    In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

19.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

20.     GEICO underwrites automobile insurance in the State of New York.

I.    **An Overview of the Pertinent Laws**

A.    **Pertinent Laws Governing No-Fault Insurance Reimbursement**

21.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

22.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

23.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD.  See N.Y. Ins. Law § 5102(a).

24.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

25.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

26.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or

"CMS-1500 form").

27.    Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

28.    Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and all other automobile insurers, must be verified by the healthcare service provider, subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete, or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.    Pertinent Statutes and Regulations Related to No-Fault Benefits for DME and OD**

29.    Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME or OD that was provided pursuant to a lawful prescription from a licensed healthcare provider.  See N.Y. Ins. Law § 5102(a).  By extension, DME or OD that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

30.    Under New York State's Public Health Law, "a practitioner may not make a referral to a health care provider for the furnishing of any health or health related items or services where such practitioner . . . has any of the following financial relationships without disclosing to the patient such financial relationship: . . . (b) a compensation arrangement". See N.Y. P.H.L. § 238-

d(1).  A practitioner is defined to include "a licensed or registered physician, dentist, podiatrist, chiropractor, nurse, midwife, physician assistant or specialist assistant, physical therapist, or optometrist".  See N.Y. P.H.L. § 238(11)

31.    A health care provider is defined to include "a purveyor of health or health related supplies, appliances or equipment", which is a DME Supplier such as Advanced Med Supplies. See N.Y. P.H.L. § 238(6).  A compensation arrangement, as referenced in N.Y. P.H.L. § 238-d, includes any remuneration, whether directly, indirectly, overly, covertly, in cash, or in kind that is between a practitioner and a health care provider. See N.Y. P.H.L. § 238-a(5)(a).

32.    DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes.  For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), hot/cold packs, infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), and whirlpool baths.

33.    OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of the spine, joints, or limbs.  These devices come in direct contact with the outside of the body, and include such items as cervical collars (i.e., "whiplash" collars), lumbar supports, knee supports, ankle supports, wrist braces, and the like.

34.    To ensure that Insureds' $50,000.00 in minimum No-Fault Benefits are not artificially depleted by inflated DME or OD charges, the maximum charges that may be submitted by healthcare providers for DME and OD are set forth in the New York Fee Schedule.

35.    In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York Insurance Department recognized the harm inflicted on Insureds by

inflated DME and OD charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

36.    As it relates to DME and OD, prior to 2022, the New York Fee Schedule set forth the maximum charges as follows:

(a)    The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices]…shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided…if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:

(1)    the acquisition cost (i.e., the line-item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs, or any sales tax) to the provider plus 50%; or

(2)    the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2 (2021).

37.    As indicated by the New York Fee Schedule, up to April 4, 2022, payment for DME or OD is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

38.    According to the New York Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME or OD is the fee payable for the item set forth in Medicaid's fee schedule ("Medicaid Fee Schedule").

39.    For Fee Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning HCPCS Codes that should be used by DME and OD companies to seek reimbursement for – among other things – Fee Schedule items.  The HCPCS Codes and their definitions provide specific

characteristics and requirements that an item of DME or OD must meet in order to qualify for reimbursement under a specific HCPCS Code.

40.    Where a specific piece of DME or OD does not have a fee payable in the Medicaid Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer, such as GEICO, to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

41.    In an effort to reduce instances of fraud committed against insurers for abusive charges relating to DME, the New York State Workers' Compensation Board replaced the old New York State Medicaid Program's Durable Medical Equipment Fee Schedule with a new New York State Workers' Compensation Durable Medical Equipment Fee Schedule ("WC DME Fee Schedule") that became effective on April 4, 2022.

42.    Among other things, the WC DME Fee Schedule limited the reimbursement rates of certain previously abused DME charges.  The charges for the reimbursement for DME by the New York State Workers' Compensation Board are reflected in 12 N.Y.C.R.R. § 442.2 (2022).

43.    Similarly, effective June 1, 2023, the New York State Department of Financial Services issued an amendment to 11 N.Y.C.R.R. 68, adding Part E of Appendix 17-C, to address No-Fault reimbursement for DME that is not specifically identified by the WC DME Fee Schedule.

44.    However, between the time period of April 4, 2022 and May 31, 2023, to address the vagueness of determining the reimbursement of No-Fault for certain changes not identified in the WC DME Fee Schedule, the New York State Department of Financial Services issued an emergency amendment explaining the standard for reimbursement when there is no price contained in the WC DME Fee Schedule.

45.    For all charges after April 4, 2022, as it relates to Non-Fee Schedule items that are

provided by a DME/OD supplier, the maximum permissible reimbursement rate is the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.  See 11 N.Y.C.R.R. 68, Appendix 17-C, Part E.

46.    For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement."  See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

47.    Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i)    The provider is in compliance with all significant statutory and regulatory requirements;

(ii)    The provider received a legitimate prescription that was  issued  in accordance with the requirements of applicable laws and is for reasonable and medically necessary DME and/or OD from a healthcare practitioner that is licensed to issue such prescriptions;

(iii)    The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s);

(iv)    The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient; and

(v)    The fee sought for DME provided to an Insured was not in excess of the

price contained in the Fee Schedule or the standard used for a Non-Fee Schedule item.

## II.    The Defendants' Fraudulent Scheme

### A.    Overview of the Defendants' Fraudulent Scheme

48.    Beginning in 2021, the DME Defendants devised and implemented a complex fraudulent scheme in which they used Advanced Med Supplies as a vehicle to bill GEICO and other New York automobile insurers millions in No-Fault Benefits to which they were never entitled to receive.

49.    To date, the DME Defendants have wrongfully obtained more than $600,000.00 from GEICO, and there is more than $700,000.00 in additional fraudulent claims that have yet to be adjudicated, but for which the DME Defendants continue to seek payment from GEICO.

50.    Elkhettab used Advanced Med Supplies to directly obtain No-Fault benefits and maximize the amount of No-Fault benefits she could obtain by submitting fraudulent bills to GEICO and other automobile insurers seeking reimbursement for the Fraudulent Equipment.

51.    DME Defendants were able to perpetrate the fraudulent scheme against GEICO described below by obtaining illegitimate prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers because of agreements with the John Doe Defendants.

52.    Elkhettab did not market or advertise Advanced Med Supplies to the general public. Advanced Med Supplies lacked any genuine retail or office location and operated without any legitimate efforts to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.  Similarly, Elkhettab did virtually nothing that would be expected of the owner of a legitimate DME supply company to develop its reputation in the medical community or to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

53.     In fact, since its formation, Advanced Med Supplies has lacked any genuine retail or office location in New York State. Advanced Med Supplies operated from its California address and a New York, New York post office box.

54.     Instead, Elkhettab entered into collusive agreements with the John Doe Defendants who were associated with both the Clincs and the Referring Providers pursuant to which kickbacks and other financial incentives were paid so that the DME Defendants would receive large volumes of prescriptions from the Referring Providers in relation to Insureds who were being treated at the Clinics.

55.     The prescriptions obtained by the DME Defendants for Fraudulent Equipment were never given to the Insureds to fill, but as part of the fraudulent scheme, routed directly to the DME Defendants from the John Doe Defendants to ensure that the Insureds did not present the prescriptions to legitimate DME suppliers, who would likely question the legitimacy of the prescription, the volume of prescriptions or the need for the DME/OD in the first instance

56.     The prescriptions obtained by the DME Defendants for Fraudulent Equipment DME and OD included prescriptions for Fraudulent Equipment, which the DME Defendants used to (i) as a basis to purportedly provide and bill for whatever DME/OD the DME Defendants decided to dispense, not what was determined based upon a prescription by a licensed healthcare professional; and (ii) misrepresented to GEICO and other automobile insurers the nature and quality of the items intended by the prescriptions to inflate the maximum reimbursement rate they were entitled to receive.

57.     After obtaining prescriptions for Fraudulent Equipment as a result of their collusive relationships with the John Doe Defendants, the DME Defendants in turn then billed GEICO for: (i) Fraudulent Equipment that was not reasonable or medically necessary; (ii) Fraudulent

Equipment that was not based on valid prescriptions from licensed healthcare providers; (iii) Fraudulent Equipment that did not represent the HCPCS codes contained in the bills to GEICO; and/or (iv) Fraudulent Equipment with inflated charges that far exceeded the value of the actual products they provided to GEICO's Insureds.

**B.    The Fraudulent Scheme – Predetermined Fraudulent Protocols Associated with the Prescriptions**

58.    DME Defendants obtained prescriptions that formed the basis to submit fraudulent billing to GEICO through predetermined fraudulent protocols that were established between and among the DME Defendants, John Doe Defendants and the Referring Providers.

59.    Through these predetermined fraudulent protocols, the DME Defendants obtained prescriptions for Fraudulent Equipment that were not medically necessary and were created solely to financially enrich the DME Defendants and John Doe Defendants, not to genuinely treat the Insureds.

60.    No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for Fraudulent Equipment to be issued upon the fraudulent protocols described below.

61.    As set forth below, the extent of the Insureds' motor vehicle accidents, physical conditions, and conservative treatment plans demonstrate a pattern of prescribing and dispensing Fraudulent Equipment to the Insureds that were not medically necessary to treat the Insureds post-accident condition.

62.    Virtually all of the Insureds who were prescribed the Fraudulent Equipment identified in Exhibit "1", were involved in relatively minor and low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all. Concomitantly, almost none of the Insureds identified in Exhibit "1", whom the Referring Providers purported to

treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

63.    In keeping with the fact that the Insureds identified in Exhibit "1" suffered only minor injuries – to the extent they had any injuries at all – as a result of the relatively minor accidents, many of the Insureds did not seek medical treatment at any hospital as a result of their accidents.

64.    To the extent the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way with nothing more serious than a minor soft tissue injury, such as a sprain or strain.

65.    However, despite virtually all the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds were subject to extremely similar treatment and medically unnecessary protocols, including nearly identical prescriptions for Fraudulent Equipment.

66.    The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibit "1" were issued pursuant to predetermined fraudulent protocols set forth with the John Doe Defendants and the Referring Providers, and not because the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

67.    Instead, the predetermined fraudulent protocols were created based upon how the John Doe Defendants, and others including the DME Defendants, could profit from exploiting prescriptions purportedly issued by the Referring Providers.

68.    In keeping with the fact that the prescriptions were based upon predetermined fraudulent protocols, not what was medically necessary for the Insureds, virtually all of the Insureds identified in Exhibit "1" who were treated by the same Referring Provider routinely received multiple items of Fraudulent Equipment of virtually the same type.

69.    For example, approximately 100% of the Insureds who were treated by Wendy Keiser DC ("Keiser") who received DME and/or OD from Advanced Med Supplies were prescribed an LSO billed to GEICO under HCPCS L0631 and approximately 99% were prescribed a cervical traction device billed to GEICO under HCPCS E0855.

70.    Similarly, approximately 98% of the Insureds who were treated by Amram Weiner, DC ("Weiner") who received DME and/or OD from Advanced Med Supplies were prescribed an LSO and "H.E.P. (Straps, Exercise Ball and Bands)" billed to GEICO under HCPCS L0631 and A9300 respectively, and approximately 97% were prescribed a cervical traction device billed to GEICO under HCPCS E0855.

71.    Similarly, approximately 96% of the Insureds who were treated by Thomasina Striano, DC ("Striano") who received DME and/or OD from Advanced Med Supplies were prescribed "H.E.P. (Anchor Straps, Ankle Cuffs, Heavy Resistance Tube, Medium Resistance Tube, Exercise Ball, Jump Rope, Hand Grip, Mesh Backpack & Workout Brochure)" billed to GEICO under HCPCS A9300, approximately 92% were prescribed an LSO billed to GEICO under HCPCS L0631 and approximately 84% were prescribed a cervical traction device billed to GEICO under HCPCS E0855.

72.    In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment from a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patient's individual

symptoms or presentation.

73.    Furthermore, in a legitimate setting, during the course of a patient's treatment, a healthcare provider <u>may</u> – but does not always – prescribe DME and/or OD that should aid in the treatment of the patient's symptoms.  The specific DME and/or OD that would be prescribed to aid the treatment of the patient would always directly relate to the patients' individual symptoms or presentation.

74.    In determining whether to prescribe DME and/or OD to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME and/or OD could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME and/or OD is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME and/or OD.  In all circumstances, any prescribed DME and/or OD would always directly relate to each patient's individual symptoms or presentation.

75.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident. For example, an individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

76.    If a healthcare provider determines that DME and/or OD is medically necessary after taking into account a patient's individual circumstances and situations, in a legitimate setting, the healthcare provider would indicate in a contemporaneous medical record, such as an evaluation report, what specific DME and/or OD was prescribed, why it was medically necessary, or how it will help the Insureds.

77.     Further, in a legitimate setting, when a patient returns for an examination after being prescribed DME and/or OD, the healthcare provider will inquire – and appropriately report – whether the previously prescribed DME and/or OD aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME and/or OD or newly issued DME and/or OD.

78.     As medically necessary DME is based upon the subjective conditions of the patient's individual needs, it is extremely improbable – to the point of impossibility – that Insureds involved in automobile accidents who were treated at a specific Clinic would routinely receive prescriptions for numerous items of Fraudulent Equipment of substantially the same type.

79.     Insureds routinely receiving multiple items of identical Fraudulent Equipment would, by extension, mean Insureds routinely reported to a specific Referring Provider complaining of the exact same symptoms.

80.     It is extremely improbable – to the point of impossibility – that a substantial number of Insureds who were treated at different Clinics with different Referring Providers around the New York metropolitan area and were purportedly issued Fraudulent Equipment from Advanced Med Supplies, would require numerous items of DME or OD of substantially the same type.

81.     Here, and in keeping with the fact that the prescriptions provided to the DME Defendants were for medically unnecessary Fraudulent Equipment obtained as part of an insurance scheme in which there were predetermined fraudulent protocols, virtually all the Insureds identified in Exhibit "1" that were treated at a specific Clinic were routinely issued numerous items of Fraudulent Equipment of substantially the same type, despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

82.     In also in keeping with the fact that the prescriptions for Fraudulent Equipment

used by the DME Defendants were medically unnecessary and obtained as part of predetermined fraudulent protocols, multiple prescriptions purportedly issued by the Referring Providers were issued on dates that the Referring Providers never even treated the Insureds.

83.     To the extent that there was a contemporaneously dated evaluation report, the evaluation report virtually always failed to explain – and oftentimes failed to identify – the Fraudulent Equipment identified on the prescriptions provided to the DME Defendants and used by the DME Defendants to bill GEICO for the charges identified in Exhibit "1".

84.     In further keeping with the fact that the prescriptions purportedly issued by the Referring Providers were medically unnecessary, when the Insureds continued to seek treatment with the Referring Providers, the follow-up examination reports generated by the Referring Providers often failed to reference, and virtually never discussed, the Insureds' previously prescribed Fraudulent Equipment, and virtually never provided any indication whether to continue using any of previously prescribed Fraudulent Equipment.

85.     Even more, and as also explained below in more detail, the prescriptions provided to the DME Defendants were for medically unnecessary Fraudulent Equipment because the DME Defendants purportedly provided Insureds with whatever DME or OD they wanted to provide Insureds, not items that were specifically identified by licensed healthcare providers.

86.     For the reasons set forth above, and below, in each of the claims identified in Exhibit "1", the DME Defendants falsely represented that the Fraudulent Equipment was provided pursuant to legitimate prescriptions from healthcare providers for medically necessary DME and/or OD, and were, therefore, entitled to collect No-Fault Benefits in the first instance, when, in fact, the prescriptions were for medically unnecessary Fraudulent Equipment issued as part of the DME Defendants insurance fraud scheme.

###### i.    Collusive Arrangements to Obtain Illegitimate and Medically Unnecessary Prescriptions

87.    In order to obtain access to Insureds so that the DME Defendants could implement and execute their fraudulent scheme and maximize the amount of No-Fault Benefits the DME Defendants could obtain from GEICO and other New York automobile insurers, the DME Defendants entered into collusive agreements with the John Doe Defendants in order to direct prescriptions to Advanced Med Supplies that were illegitimate and for medically unnecessary Fraudulent Equipment.

88.    Since Advanced Med Supplies' inception, the DME Defendants engaged in various collusive arrangements with the John Doe Defendants pursuant to which Defendants paid kickbacks or other financial incentives in exchange for being provided prescriptions to fill from the Referring Providers for the Fraudulent Equipment that could then be used to support the Fraudulent Equipment dispensed by Advanced Med Supplies.

89.    The DME Defendants chose to obtain prescriptions from the Referring Providers through collusive arrangements with the John Doe Defendants because they did not operate like a bona fide DME supplier. Advanced Med Supplies, as a California-based entity, and Elkhettab, as a California resident, were not local to market their services to Insureds or to the Referring Providers. In fact, the DME Defendants could not establish legitimate referral connections because they did not maintain a retail presence in New York State and only obtained a post office box in New York, New York.

90.    However, the collusive nature of the arrangement goes beyond the simple of payment of money or other financial incentives, but includes (i) payment to fictitious businesses associated with the John Doe Defendants, (ii) the ability to secure the prescriptions without ever meeting the Referring Providers, (iii) obtaining the prescriptions directly from the staff at the

Clinics, without any communication or involvement by the Insureds, (iv) providing the Fraudulent Equipment to the Clinic and its staff, with any interaction with the Insureds, and without any interaction with the DME Defendants.

91.     The collusive arrangements allowed the scheme to remain undetected by the Insured and allowed the DME Defendants to access large volumes of prescriptions that in turn afforded them the opportunity to submit charges for thousands of dollars in Fraudulent Equipment for each Insured to GEICO and other automobile insurers.   But for the collusive arrangements, neither the John Doe Defendants nor the Referring Providers would have had no reason to direct a substantial volume of these medically unnecessary prescriptions for Fraudulent Equipment to Advanced Med Supplies to purportedly fill.

92.     Upon information and belief, the Referring Providers were compensated by the John Doe Defendants, whether financially or through some other economic quid pro quo (e.g. the ability to treat the Insured and independently bill GEICO), for the Referring Providers' willingness to permit prescriptions to be issued in their names and to be given to DME suppliers, including Advanced Med Supplies, rather than given to the Insureds or to a bona-fide DME supplier, who would likely question its legitimacy.

93.     The collusive relationship between the DME Defendants and John Doe Defendants in relation to the prescriptions are the very kind of arrangement that is prohibited by N.Y. Public Health Law § 238-d, without a specific disclosure to the patient of the financial relationship between the Referring Provider and Advanced Med Supplies.   In actuality, no such disclosure required by Public Health Law § 238-d was ever disclosed to the Insureds identified in Exhibit "1".  Rather, because of the nefarious nature of the relationship between the DME Defendants and the John Doe Defendants, the arrangements between and among the DME Defendants, John Doe

Defendants, and Referring Providers were concealed from the Insureds.

94.    In keeping with the fact the DME Defendants used collusive relationships with the John Doe Defendants to obtain prescriptions for Fraudulent Equipment: (i) Elkhettab never met the Referring Providers who issued the prescriptions; (ii) the DME Defendants obtained prescriptions directly from the Clinics, without any communications or involvement by the Insureds; and (iii) to the extent that the Insureds were provided with any of the Fraudulent Equipment, the Fraudulent Equipment were provided by staff at the Clinics and without any involvement or interaction by the DME Defendants.

95.    As a result of these collusive relationships, the Defendants (rather than the Insured or a bona-fide DME supplier) were given the illegitimate prescriptions, which (i) were medically unnecessary Fraudulent Equipment that was not based upon each Insured's individual need; (ii) contained a photocopied signature of the Referring Provider; (iii) were issued on a date the Referring Provider did not treat or otherwise examine the Insured; and/or (iv) were pre-signed/boilerplate with the patient names changed.

96.    For example, as a result of these collusive relationships the DME Defendants were able to obtain the following pre-signed prescriptions purportedly issued by various Referring Providers:

> (i)    On July 31, 2024, Striano purportedly prescribed a "Cervical Traction", "Lumbar Braces (LSO) – W/WO Straps Size MED", "H.E.P. (Anchor Straps, Ankle Cuffs, Heavy Resistance Tube, Medium Resistance Tube, Exercise Ball, Jump Rope, Hand Grip, Mesh Backpack & Workout Brochure)" to an Insured named MA. The prescription originated from a No-Fault Clinic located at 66S Pelham Parkway N Suite 402 Bronx New York 10467 (the "Pelham Parkway Clinic") and contained the following photocopied or stamped signature:



Physician's Signature                                    Date    7/31/24

(ii)     On October 7, 2024, Striano purportedly prescribed a "Cervical Traction", "Lumbar Braces (LSO) – W/WO Straps Size MED", "H.E.P. (Anchor Straps, Ankle Cuffs, Heavy Resistance Tube, Medium Resistance Tube, Exercise Ball, Jump Rope, Hand Grip, Mesh Backpack & Workout Brochure)" to an Insured named AM. The prescription originated from the Pelham Parkway Clinic and contained the following photocopied or stamped signature:



(iii)    On October 28, 2024, Striano purportedly prescribed a "Cervical Traction", "Lumbar Braces (LSO) – W/WO Straps Size MED", "H.E.P. (Anchor Straps, Ankle Cuffs, Heavy Resistance Tube, Medium Resistance Tube, Exercise Ball, Jump Rope, Hand Grip, Mesh Backpack & Workout Brochure)" to an Insured named RY. The prescription originated from the Pelham Parkway Clinic and contained the following photocopied or stamped signature:



(iv)    On July 1, 2024, Striano purportedly prescribed a "Cervical Traction", "Lumbar Braces (LSO) – W/WO Straps Size LRG", "H.E.P. (Anchor Straps, Ankle Cuffs, Heavy Resistance Tube, Medium Resistance Tube, Exercise Ball, Jump Rope, Hand Grip, Mesh Backpack & Workout Brochure)" to an Insured named KY. The prescription originated from the Pelham Parkway Clinic and contained the following photocopied or stamped signature:



(v)     On March 16, 2023, Weiner purportedly prescribed a "Cervical Traction", "Lumbar Braces (LSO) – W/WO Straps", "H.E.P. (Straps, Exercise Ball and Bands)" to an Insured named AQ. The prescription originated from a No-Fault Clinic located at 90-46 Corona Avenue, Elmhurst, New York (the "Corona Avenue Clinic") and contained the following photocopied or stamped signature:



(vi)    On March 16, 2023, Weiner purportedly prescribed a "Cervical Traction", "Lumbar Braces (LSO) – W/WO Straps", "H.E.P. (Straps, Exercise Ball and Bands)" to an Insured named KB. The prescription originated from the Corona Avenue Clinic and contained the following photocopied or stamped signature:



(vii)   On January 9, 2024, Weiner purportedly prescribed a "Cervical Traction", "Lumbar Braces (LSO) – W/WO Straps", "H.E.P. (Straps, Exercise Ball and Bands)" to an Insured named PA. The prescription originated from the Corona Avenue Clinic and contained the following photocopied or stamped signature:



(viii)  On April 13, 2024, Weiner purportedly prescribed a "Cervical Traction", "Lumbar Braces (LSO) – W/WO Straps", "H.E.P. (Straps, Exercise Ball and Bands)" to an Insured named CA. The prescription originated from the Corona Avenue Clinic and contained the following photocopied or stamped signature:



(ix)    On March 23, 2024, Weiner purportedly prescribed a "Cervical Traction", "Lumbar Braces (LSO) – W/WO Straps", "Cold Therapy Unit" and "H.E.P. (Straps, Exercise Ball and Bands)" to an Insured named YF. The prescription originated from the Corona Avenue Clinic and contained the following photocopied or stamped signature:



(x)     On January 31, 2023, Wei Hong Xu, NP ("NP Xu") purportedly prescribed a "Cervical Traction" and "Lumbar Braces (LSO) – W/WO Straps Size: Med" to an Insured named LG. The prescription originated from the Clinic at 486 McDonald Avenue Brooklyn New York 11218 (the "McDonald Avenue Clinic") and contained the following photocopied or stamped signature:



(xi)    On June 9, 2023, NP Xu purportedly prescribed a "Cervical Traction" and "Lumbar Braces (LSO) – W/WO Straps Size: Med" to an Insured named MB. The prescription originated from the McDonald Avenue Clinic and contained the following photocopied or stamped signature:



(xii)   On February 23, 2024, NP Xu purportedly prescribed a "Cervical Traction", "Lumbar Braces (LSO) – W/WO Straps Size: Med" and "Shoulder brace size medium" to an Insured named BB. The prescription originated from the McDonald Avenue Clinic and contained the following photocopied or stamped signature:



(xiii)  On February 9, 2024, NP Xu purportedly prescribed a "Cervical Traction", "Lumbar Braces (LSO) – W/WO Straps Size: Med", "Shoulder brace" and "Knee brace" to an Insured named MM. The prescription originated from the McDonald Avenue Clinic and contained the following photocopied or stamped signature:



(xiv) On June 9, 2024, NP Xu purportedly prescribed a "Cervical Traction", "Lumbar Braces (LSO) – W/WO Straps Size: Med", to an Insured named AM. The prescription originated from the McDonald Avenue Clinic and contained the following photocopied or stamped signature:



97.    The DME Defendants were able to obtain these illegitimate prescriptions for Fraudulent Equipment due to their collusive arrangements with the John Doe Defendants at each of the Clinics, which gave them access to the illegitimate prescriptions.

98.    In contrast to a bona fide DME supplier, the DME Defendants were willing to obtain illegitimate prescriptions through collusive arrangements and submit the illegitimate prescriptions to support their charges to GEICO and other automobile insurers.

99.    These Clinics included but were not limited to: (i) 1 Fulton Avenue, Hempstead, New York (the "Fulton Avenue Clinic"); (ii) 115 Meacham Avenue, Elmont, New York (the "Meacham Avenue Clinic"); (iii) 1 Cross Island Plaza, Rosedale, New York (the "Cross Island Plaza Clinic"); and (iv) 108 Kenilworth Place, Brooklyn, New York (the "Kenilworth Place Clinic").

100.    Although ostensibly organized to provide a range of healthcare services to Insureds at a single location, many of the Clinics operate under the unlawful ownership and control of unlicensed laypersons, with a revolving door of healthcare providers providing treatment to the Insureds and other patients without any continuity of care.

101.    In fact, GEICO has received billing from many of the Clinics from an ever-

changing number of healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name, beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's No-Fault insurance system.

102. For example, GEICO has received billing for purported healthcare services rendered at the Cross Island Plaza Clinic from a "revolving door" of over 140 different healthcare providers.

103. Similarly, GEICO has received billing for purported healthcare services rendered at the Kenilworth Place Clinic from a "revolving door" of over 110 different healthcare providers.

104. Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, create and control the patient base at the Clinics, and direct fraudulent protocols to be used to maximize the generation of revenue for their benefit and the benefit of those with whom they are associated without regard to actual patient care.

105. But for the collusive agreements between the DME Defendants and the John Doe Defendants, the John Doe Defendants and the Referring Providers would not have had any reason to direct a substantial volume of medically unnecessary prescriptions to Advanced Med Supplies, a company located in California with no retail presence in New York State.

### ii.    Examples of the Predetermined Fraudulent Protocols

106. Through the DME Defendants participation in collusive arrangements with the John Doe Defendants, the DME Defendants were able to obtain medically unnecessary and otherwise illegitimate prescriptions for Fraudulent Equipment purportedly issued from the Referring Providers, pursuant to predetermined fraudulent protocols.

107.    In keeping with the fact that the prescriptions provided to the DME Defendants to dispense were for medically unnecessary Fraudulent Equipment obtained as part of predetermined fraudulent protocols, many of the Insureds identified in Exhibit "1" were issued virtually identical prescriptions for predetermined Fraudulent Equipment.

108.    Similarly, and in keeping with the fact that the DME and OD dispensed by Advanced Med Supplies were not medically necessary and were prescribed and dispensed pursuant to predetermined protocols to maximize profits, Advanced Med Supplies routinely received prescriptions to dispense an array of substantially identical – if not exactly identical – Fraudulent Equipment to Insureds involved in the same accident.

109.    For example:

(i)    On August 30, 2023, two Insureds – BU and JU – were involved in the same automobile accident. Thereafter, BU and JU both presented to the same Clinic for treatment. Shortly after a purported examination at the Clinic, they were each purportedly prescribed a "Cervical Traction" and "Lumbar Braces (LSO) – W/WO Straps" both billed to GEICO under HCPCS E0855 and L0631, respectively, pursuant to virtually identical prescriptions. BU and JU were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Advanced Med Supplies.

(ii)    On July 11, 2024, two Insureds– SR and RT – were involved in the same automobile accident. Thereafter, SR and RT both presented to the same Clinic for treatment. Shortly after a purported examination at the Clinic, they were each purportedly prescribed a "Shoulder-rt-lrg", "H.E.P. (Anchor Straps, Ankle Cuffs, Heavy Resistance Tube, Medium Resistance Tube, Exercise Ball, Jump Rope, Hand Grip, Mesh Backpack & Workout Brochure)", and "E.M.S. Unit" each billed to GEICO under HCPCS L3671, A9300, and E0762, respectively, pursuant to virtually identical prescriptions. SR and RT were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for

Fraudulent Equipment that was dispensed by Advanced Med Supplies.

(iii)    On May 20, 2022, two Insureds – EJ and MJ – were involved in the same automobile accident. Thereafter, EJ and MJ both presented to the same Clinic for treatment. Shortly after a purported examination at the Clinic, they were each purportedly prescribed a "Cervical Traction" and "Lumbar Air Form Braces - W/WO Straps" both billed to GEICO under HCPCS E0855 and L0631, respectively, pursuant to virtually identical prescriptions. EJ and MJ were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Advanced Med Supplies.

(iv)    On January 14, 2024, two Insureds – KV and LV – were involved in the same automobile accident. Thereafter, KV and LV both presented to the same Clinic for treatment. Shortly after a purported examination at the Clinic, they were each purportedly prescribed a "Cervical Traction W/ Pump", "LSO W/APL Control Fitted/ADJ, "Lumbar Cushion", and "T.E.N.S. Unit" each billed to GEICO under HCPCS E0855, L0637, L0190, and E0730, respectively, pursuant to virtually identical prescriptions. KV and LV were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Advanced Med Supplies.

(v)    On September 8, 2021, two Insureds – LC and CV – were involved in the same automobile accident. Thereafter, LC and CV both presented to the same Clinic for treatment. Shortly after a purported examination at the Clinic, they were each purportedly prescribed a "Cervical Traction" and "Lumbar Braces LSO- W/WO Straps" both billed to GEICO under HCPCS E0855 and L0631, respectively, pursuant to virtually identical prescriptions. LC and CV were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Advanced Med Supplies.

(vi)    On September 24, 2024, three Insureds – SLM, YM, and JM – were involved in the same automobile accident. Thereafter, SLM, YM, and JCM each presented to the same Clinic for treatment. Shortly after a purported examination at the Clinic, they were each purportedly prescribed a

"Cervical Traction", "Lumbar Braces (LSO)- W/WO Straps", "Cold Therapy Unit", and "H.E.P. (Straps, Exercise Ball, and Bands)" each billed to GEICO under HCPCS E0855, L0631, E0217, and A9300, respectively, pursuant to virtually identical prescriptions. SLM, YM, and JCM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Advanced Med Supplies.

(vii)    On May 18, 2024, two Insureds– EB and JS – were involved in the same automobile accident. Thereafter, EB and JS both presented to the same Clinic for treatment. Shortly after a purported examination at the Clinic, they were each purportedly prescribed a "Cervical Traction W/ Pump", "LSO W/APL Control Fitted/ADJ", "Lumbar Cushion", and "T.E.N.S. Unit" each billed to GEICO under HCPCS E0855, L0637, L0627, and E0762, respectively, pursuant to virtually identical prescriptions. EB and JS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Advanced Med Supplies.

(viii)    On December 14, 2024, two Insureds – JM and WE – were involved in the same automobile accident. Thereafter, JM and WE both presented to the same Clinic for treatment. Shortly after a purported examination at the Clinic, they were each purportedly prescribed, among other things, a "Cervical Collar", "Lumbo Sacral Support", "Lumbar Cushion", "Orthopedic Car Seat", billed under HCPCS L0200, L0631, E2612, and T5001, respectively, pursuant to virtually identical prescriptions. JM and WE were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Advanced Med Supplies.

(ix)    On June 18, 2024, two Insureds – EM and TM – were involved in the same automobile accident. Thereafter, EM and TM both presented to the same Clinic for treatment. Shortly after a purported examination at the Clinic, they were each purportedly prescribed a "Cervical Traction" and "Lumbar Braces (LSO) – W/WO Straps" both billed to GEICO under HCPCS E0855 and L0631, respectively, pursuant to virtually identical prescriptions. EM and TM were different ages, in different physical condition, and

experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Advanced Med Supplies.

(x)     On May 8, 2024, three Insureds – AG, MG, and AG – were involved in the same automobile accident. Thereafter, AG, MG, and AG, each presented to the same Clinic for treatment. Shortly after a purported examination at the Clinic, they were each purportedly prescribed a "Shoulder Brace- size large", "Knee Brace - size large", and "H.E.P. (Straps, Exercise Ball, and Bands)" each billed to GEICO under HCPCS L3671, L1832, and A3900, respectively, pursuant to virtually identical prescriptions. AG, MG, and ArG were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Advanced Med Supplies.

110.    These are only representative examples.

111.    In further keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were issued pursuant to predetermined protocols established and exploited used by the DME Defendants, at times the prescriptions were purportedly issued on dates that the Insureds never treated with the Referring Providers.

112.    For example:

(i)     Insured JN was allegedly involved in a motor vehicle accident on August 7, 2022. On December 13, 2022, Advanced Med Supplies purportedly provided JN with a "Lumbar Brace" and "Cervical Traction" pursuant to a prescription purportedly issued by Muriel Fortune, DC ("Fortune") on November 19, 2022. There is no evidence Fortune examined or otherwise treated JN on November 19, 2022.

(ii)    Insured KP was allegedly involved in a motor vehicle accident on May 1, 2021. On July 26, 2021, Advanced Med Supplies purportedly provided KP with a "Shoulder Brace" and "Fitness Kit" pursuant to a prescription purportedly issued by Wendell Joseph Gorum, MD ("Gorum") on July 24, 2021. There is no evidence Gorum examined or otherwise treated KP on July 24, 2021.

(iii)   Insured SM was allegedly involved in a motor vehicle accident on June 8, 2022. On September 14, 2022, Advanced Med Supplies purportedly provided SM with a "Shoulder Brace" and "Fitness Kit" pursuant to a prescription purportedly issued by Gorum on August 23, 2022. There is no evidence Gorum examined or otherwise treated SM on August 23, 2022.

(iv)   Insured PS was allegedly involved in a motor vehicle accident on March 29, 2023. On April 25, 2023, Advanced Med Supplies purportedly provided PS with a "Cervical Traction" and "Lumbar Braces (LSO) – W/WO Straps" pursuant to a prescription purportedly issued by Curtis Blumenthal, DC ("Blumenthal") on April 20, 2023. There is no evidence Blumenthal examined or otherwise treated PS on April 20, 2023.

(v)   Insured BC was allegedly involved in a motor vehicle accident on November 1, 2022. On March 20, 2023, Advanced Med Supplies purportedly provided BC with a "Lumbar Brace", "Cervical Traction", and "Fitness Kit" pursuant to a prescription purportedly issued by Weiner on March 6, 2023. There is no evidence Weiner examined or otherwise treated BC on March 6, 2023.

(vi)   Insured RY was allegedly involved in a motor vehicle accident on September 19, 2024. On October 28, 2024, Advanced Med Supplies purportedly provided RY with a "Lumbar Brace" and "Cervical Traction" pursuant to a prescription purportedly issued by Striano on October 28, 2024. There is no evidence Striano examined or otherwise treated RY on October 28, 2024.

(vii)   Insured SS was allegedly involved in a motor vehicle accident on April 27, 2022. On August 26, 2022, Advanced Med Supplies purportedly provided SS with a "Shoulder Brace" and "Fitness Kit" pursuant to prescription purportedly issued by Gorum on August 23, 2022. There is no evidence Gorum examinee or otherwise treated SS on August 23, 2022.

(viii)   Insured KL was allegedly involved in a motor vehicle accident on May 8, 2024. On July 3, 2024, Advanced Med Supplies purportedly provided Kydeshia Langdon with a "Lumbar Brace" and "Cervical Traction" pursuant to prescription purportedly issued by Gorum on July 1, 2024. There is no evidence Gorum examined or otherwise treated Kydeshia Langdon on July 1, 2024

(ix)   Insured PG was allegedly involved in a motor vehicle accident on August 13, 2023. On November 8, 2023, Advanced Med Supplies purportedly provided PG with a "Shoulder Brace", "Wrist Brace", and

"Fitness Kit" pursuant to prescription purportedly issued by Gorum on October 17, 2023. There is no evidence Gorum examined or otherwise treated PG on October 17, 2023.

(x)  Insured SS was allegedly involved in a motor vehicle accident on April 13, 2023. On April 18, 2023, Advanced Med Supplies purportedly provided SS with a "Lumbar Brace" and "Cervical Traction" pursuant to a prescription purportedly issued by Blumenthal on April 14, 2023. There is no evidence Blumenthal examined or otherwise treated SS on April 13, 2023.

113.    Furthermore, and in keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were used by the DME Defendants for financial exploitation of the Insureds' No-Fault Benefits, there were, at times, significant delays between the date on which the prescription was issued and the date on which it was delivered to the Insured.

114.    For example:

(i)   Insured AG was purportedly involved in a motor vehicle accident on October 18, 2024. Thereafter, AG sought treatment with Rehan Khan NP ("NP Khan") of KV Medical of NY PC ("KV Medical") at a No-Fault Clinic located at 56-30 Myrtle Avenue, Ridgewood, New York (the "56-30 Myrtle Avenue Clinic"). On October 31, 2024, NP Khan issued a prescription to AG for "Cervical Traction w/ Pump", "LSO w/ APL Control Fitted/ADJ", "Lumbar Cushion", and "EMS Unit". On January 3, 2025, over two months later, Advanced Med Supplies delivered a "Cervical Traction", "Lumbar Cushion", "Ortho Custom Lumbar Brace", and "EMS Unit" to AG pursuant to the prescription purportedly ordered by NP Khan on October 31, 2024.

(ii)  Insured MC was purportedly involved in a motor vehicle accident on April 27, 2024. Thereafter, MC sought treatment with Irfan David NP ("NP David") of Ketan Vora DO PC ("KV PC") at the 56-30 Myrtle Avenue Clinic. On June 20, 2024, NP David issued a prescription to MC for "LSO w/ APL Control Fitted/ADJ", "Lumbar Cushion", and "EMS Unit". On August 20, 2024, two months later, Advanced Med Supplies delivered a "Lumbar Cushion", "Ortho Custom Lumbar Brace", and "EMS Unit" to MC pursuant to the prescription purportedly ordered by NP David on June 20, 2024.

(iii) Insured AT was purportedly involved in a motor vehicle accident on July 7, 2024. Thereafter, AT sought treatment with NP David KDV Medical PC ("KDV Med") at a No-Fault Clinic located at 171-19 Hillside Avenue, Jamaica, New York (the "Hillside Avenue Clinic"). On July 10, 2024, NP David issued a prescription to AT for "Cervical Traction w/ Pump", "LSO

w/ APL Control Fitted/ADJ", "Lumbar Cushion", and "T.E.N.S. Unit". On August 7, 2024, nearly one month later, Advanced Med Supplies delivered a "Cervical Traction", "Lumbar Cushion", "Ortho Custom Lumbar Brace", and "EMS Unit" to MC pursuant to the prescription purportedly ordered by NP David on July 10, 2024.

(iv)     Insured JS was purportedly involved in a motor vehicle accident on January 31, 2024. Thereafter, JS sought treatment with Randolph Rosarion MD ("Rosarion") of KV Med at the 56-30 Myrtle Avenue Clinic. On February 22, 2024, Rosarion issued a prescription to JS for "Cervical Traction w/ Pump", "LSO w/ APL Control Fitted/ADJ", "Lumbar Cushion", and "T.E.N.S. Unit". On March 29, 2024, over one month later, Advanced Med Supplies dispensed "Cervical Traction", "Lumbar Cushion", "Ortho Custom Lumbar Brace", and "T.E.N.S. Unit" to JS pursuant to the prescription purportedly ordered by Rosarion on February 22, 2024.

(v)      Insured KR was purportedly involved in a motor vehicle accident on May 31, 2024. Thereafter, KR sought treatment with Ketan Vora DO ("Vora") of KV PC at a No-Fault Clinic located at 116-24 Queens Boulevard, Forest Hills, New York (the "Queens Boulevard Clinic"). On July 12, 2024 Vora purportedly prescribed a "Cervical Traction w/ Pump", "LSO w/ APL Control Fitted/ADJ", "Lumbar Cushion", and "E.M.S. Unit". On August 5, 2024, approximately three weeks later, Advanced Med Supplies dispensed "Cervical Traction", "Lumbar Cushion", "Ortho Custom Lumbar Brace", and "E.M.S. Unit" to KR pursuant to the prescriptions purportedly ordered by Vora on July 12, 2024.

(vi)     Insured DP was purportedly involved in a motor vehicle accident on November 10, 2024. Thereafter, DP sought treatment with Homan Yeung DC ("Yeung") of Optimal Health Chiropractic & Acupuncture PC ("Optimal Health") at a No-Fault Clinic located at 66-42 Myrtle Avenue, Glendale, New York (the "66-42 Myrtle Avenue Clinic"). On November 15, 2024, Yeung issued a prescription to DP for "Cervical Traction" and "Lumbar Braces (LSO)- W/WO Straps". On January 3, 2025, over six weeks later, Advanced Med Supplies delivered a "Cervical Traction" and "Ortho Custom Lumbar Brace" to DP pursuant to the prescription purportedly ordered by Yeung on November 15, 2024.

(vii)    Insured SF was purportedly involved in a motor vehicle accident on July 19, 2022. Thereafter, SF sought treatment with Magda Fahmy MD ("Fahmy") of Dr. Sallbs Medical Practice PC ("Salbs Med") at the Queens Boulevard Clinic. On August 8, 2022, Fahmy issued a prescription to SF for "Cervical Traction w/ Pump", "LSO w/ APL Control Fitted/ADJ", "Lumbar Cushion", and "T.E.N.S Unit". On August 29, 2022, nearly three weeks later, Advanced Med Supplies delivered a "Cervical Spinal Decompression", "Ortho Custom Lumbar Corset", "Lumbar Cushion", and "TENS Unit" to SF pursuant to the prescription purportedly ordered by

Fahmy on August 8, 2022.

(viii)  Insured CA was purportedly involved in a motor vehicle accident on March 29, 2024. Thereafter, CA sought treatment with Weiner of WYQNY Chiropractic, PC at the Corona Avenue Clinic. On April 13, 2024, Weiner issued a prescription to CE for "Cervical Traction", "Lumbar Braces W/WO Straps" and "H.E.P. (Straps, Exercise Ball, and Bands)". Weeks later, on May 1, 2024, Advanced Med Supplies purportedly delivered a "Cervical Spinal Decompression" and "Ortho Custom Lumbar Corset" to CA, and on May 6, 2024, Advanced Med Supplies purportedly delivered a fitness kit to CA, pursuant to the prescription purportedly ordered by Weiner on April 13, 2024.

(ix)  Insured JF was purportedly involved in a motor vehicle accident on July 10, 2024. Thereafter, JF sought treatment with Weiner of WYQNY Chiropractic, PC at the Corona Avenue Clinic. On December 19, 2024, Weiner issued a prescription to JF for "Cervical Traction", "Lumbar Braces (LSO) – W/WO Straps", and "H.E.P. (Straps, Exercise Ball and Bands)". On January 7, 2025, nearly three weeks later, Advanced Med Supplies delivered a "Cervical Traction", "Ortho Custom Lumbar Brace", and "Cold Therapy" to JF pursuant to the prescription purportedly ordered by Weiner on December 19, 2024.

(x)  Insured TG was purportedly involved in a motor vehicle accident on May 15, 2021. Thereafter, TG sought treatment with NP Xu of Macintosh Medical PC at the Clinic at 3805 Church Avenue, Brooklyn New York 11203. On September 13, 2021, NP Xu issued a prescription to TG for "Shoulder Support", "TENS Unit with belt and accessory kit" and "Fitness Kit". On October 20, 2021, over a month later, Advanced Med Supplies delivered a "Fitness Kit", "TENS Unit", and "Shoulder Brace" pursuant to the prescription purportedly ordered by NP Xu on September 13, 2021.

115.  These are only representative examples.

116.  In further keeping with the fact that the prescriptions for Fraudulent Equipment purportedly issued to the Insureds identified in Exhibit "1" were not medically necessary but were the result of a predetermined fraudulent protocol, the prescriptions contained vague and generic descriptions for DME and OD, to allow the DME Defendants to choose the specific type of Fraudulent Equipment that they billed GEICO and other New York automobile insurers.

**C.  DME Defendants' Manipulation of the Prescriptions**

117.  Once the DME Defendants obtained the prescriptions purportedly issued by the

Referring Providers as a result of the DME Defendants collusive arrangements with the John Doe Defendants, the DME Defendants used the prescriptions to submit bills to GEICO that fraudulently misrepresented what was prescribed by the Referring Providers so as to obtain more No-Fault Benefits.

118.    In doing so, the DME Defendants did not bill GEICO for medically necessary DME and OD as determined by a licensed healthcare provider. Instead, the DME Defendants unlawfully decided what DME and OD to provide Insureds without a proper prescription from a licensed healthcare provider.

119.    As part of the DME Defendants fraudulent scheme and collusive arrangements with the John Doe Defendants, they utilized the vague and generic prescriptions purportedly issued by the Referring Providers to misrepresent the nature of the items actually prescribed and submitted billing that misrepresented that the Fraudulent Equipment was for DME/OD that was determined by a licensed healthcare provider to be medically necessary for each Insured.

120.    Upon obtaining the vague and generic prescriptions from John Doe Defendants pursuant to the predetermined protocols and collusive arrangements described above, the Defendants were provided with the opportunity to choose one of several different pieces of Fraudulent Equipment, with varying reimbursement rates in the applicable fee schedule, that relate to the vague and generic terms indicated in the prescriptions.

121.    The ability to choose which specific type of DME and/or OD to provide an individual is specifically reserved for healthcare providers authorized by law to prescribe DME and/or OD.

122.    As an unlicensed healthcare professional, Elkhettab was and is not legally authorized to prescribe or direct that an Insured receive any specific type of DME and/or OD.

Similarly, Advanced Med Supplies is not a licensed professional corporation and does not employ any healthcare professionals who can legally prescribe or direct that an Insured receive any specific type of DME and/or OD.

123.    However, when the DME Defendants received vague and generic prescriptions for Fraudulent Equipment to purportedly provide Insureds, many of the items in the prescriptions were not specific enough to identify a specific item of DME and/or OD that could be provided to the Insureds.

124.    As a result, whenever the vague and generic prescriptions identified a type of Fraudulent Equipment that had multiple different HCPCS Codes, which are based on the specific and unique features associated with the item, the DME Defendants chose to bill GEICO using specific HCPCS Codes thereby asserting that they purportedly provided those unique pieces of Fraudulent Equipment to the Insureds.

125.    In a legitimate setting, upon receiving a vague and generic prescription for a type of DME and/or OD, the provider of DME and/or OD would contact the referring healthcare provider to request clarification on the specific items and features necessary to dispense to each patient.

126.    However, in all of the claims identified in Exhibit "1", whenever there was a vague and generic prescription for a type of DME and/or OD, the DME Defendants never contacted the Referring Provider to request clarification. Instead, the DME Defendants made their own determination as to which unique item of Fraudulent Equipment to provide each Insured.

127.    Furthermore, in each and every circumstance where the vague and generic prescriptions allowed the DME Defendants to choose a unique piece of Fraudulent Equipment, the DME Defendants billed GEICO for, and thereby chose to purportedly provide the Insured with,

the type of Fraudulent Equipment that resulted in one of the higher maximum reimbursable amounts under the applicable fee schedule.

128.    For example, in many of the prescriptions issued to the DME Defendants that are part of the claims identified in Exhibit "1", the prescriptions requested that the DME Defendants provide such generic items as "Lumbar Braces (LSO)- W/WO Straps" or "Lumbo Sacral Support", without any further specification.

129.    This vague and generic language in the prescriptions from the Referring Providers for lumbar supports directly relates to over 20 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount, that can be dispensed to Insureds, including:

(i)    HCPCS Code L0625, a lumbar orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $43.27.

(ii)    HCPCS Code L0626, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $61.25.

(iii)    HCPCS Code L0627, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $322.98.

(iv)    HCPCS Code L0628, a lumbar-sacral orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $65.92.

(v)    HCPCS Code L0629, a lumbar-sacral orthosis device that is flexible and custom fabricated, which has a maximum reimbursement rate of $175.00.

(vi)    HCPCS Code L0630, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $127.26.

(vii)    HCPCS Code L0631, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $806.64.

(viii)   HCPCS Code L0632, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is custom fabricated, which has a maximum reimbursement rate of $1,150.00.

(ix)   HCPCS Code L0633, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $225.31.

(x)   HCPCS Code L0634, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $759.92.

(xi)   HCPCS Code L0635, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is prefabricated, which has a maximum reimbursement rate of $765.98.

(xii)   HCPCS Code L0636, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1,036.35.

(xiii)   HCPCS Code L0637, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xiv)   HCPCS Code L0638, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1,036.35.

(xv)   HCPCS Code L0639, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xvi)   HCPCS Code L0640, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $822.21.

(xvii)   HCPCS Code L0641, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $53.80.

(xviii)   HCPCS Code L0642, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $283.76.

(xix)   HCPCS Code L0643, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum

reimbursement rate of $111.80.

(xx)    HCPCS Code L0648, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $708.65.

(xxi)   HCPCS Code L0649, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $197.95.

(xxii)  HCPCS Code L0650, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

(xxiii) HCPCS Code L0651, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

130.    As an unlicensed healthcare provider, Advanced Med Supplies is and was not legally permitted to determine which of the above-available options were best suited for each Insured that had generic prescriptions for "Lumbar Braces (LSO)- W/WO Straps" or "Lumbo Sacral Support".

131.    Here, the DME Defendants never contacted any of the Referring Providers whose names appeared on the vague and generic prescriptions for lumbar related Fraudulent Equipment and instead took it upon themselves to decide which specific type of Fraudulent Equipment they would bill GEICO for, and accordingly purportedly provide the Insureds.

132.    The DME Defendants typically submitted charges of either $502.63 or $844.13 using HCPCS code L0631 pursuant to generic prescriptions for "Lumbar Braces (LSO)- W/WO Straps" or "Lumbo Sacral Support", which has one the higher maximum reimbursable amounts out of the lumbar support items in the Fee Schedule.

133.    As an additional example, and as identified in Exhibit "1," the DME Defendants regularly submitted charges $607.55 under HCPCS Code L1832 for purportedly supplying

Insureds with a "knee brace." Similar to the charges for LSOs, the phrase "knee brace" applies to over 20 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount, that can be dispensed to Insureds.

134.    As an additional example, and as identified in Exhibit "1," the DME Defendants regularly submitted charges for between $690.23 and $766.12 under HCPCS Code L3671 for purportedly supplying Insureds with a "shoulder brace." Similar to the charges for LSOs and knee orthoses, the phrase "shoulder brace" applies to multiple different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount, that can be dispensed to Insureds.

135.    As a result, the DME Defendants billed GEICO for purportedly providing Insureds with OD, not based upon determinations by licensed healthcare providers for what was medically necessary but, based upon the decisions by the DME Defendants – who are unlicensed laypersons.

136.    In addition to choosing the type of OD to purportedly provide insureds based upon vague and generic descriptions, the DME Defendants also billed GEICO for DME and OD based on vague prescriptions that identified two different items of DME.

137.    In keeping with the fact that the Fraudulent Equipment purportedly provided to Insureds was not based upon decisions made by laypersons, not the determination of a Referring Provider licensed to make medical necessity determinations, certain prescriptions used by the DME Defendants to bill GEICO purported to identify two different types of DME as the HCPCS Code on the prescription did not correspondent with the DME described. identified.

138.    Upon receipt of the internally inconsistent prescriptions the DME Defendants did not contact the Referring Provider to clarify what was being prescribed. Instead, the DME Defendants purportedly dispensed DME that they wanted to bill GEICO, and other automobile

insurers, using HCPCS Codes that contained high reimbursement amounts, solely for their financial benefit.

139.    For example:

(i)     Insured AT was purportedly involved in a motor vehicle accident on July 7, 2024. Thereafter, NP David of KV PC issued a prescription to AT for, among other things, an (i) "L0627 Lumbar Cushion", and an (ii) an "E0762 T.E.N.S. Unit". However, HCPCS L0627 corresponds to a custom fit Lumbar Orthosis, not a Lumbar Cushion, and HCPCS E0762 corresponds to a Transcutaneous Electrical Joint Stimulation Device ("TEJSD"), not a T.E.N.S. Unit. Despite the inconsistency, Advanced Med Supplies billed GEICO under HCPCS Codes L0627 and E0762 in order to obtain higher No-Fault Benefits.

(ii)    Insured SY was purportedly involved in a motor vehicle accident on February 6, 2024. Thereafter, Vora of KV PC issued a prescription to SY for, among other things, an "L0190 Lumbar Cushion". However, HCPCS L0190 corresponds to a Cervical Collar, not a Lumbar Cushion. Despite the inconsistency, Advanced Med Supplies billed GEICO under HCPCS Codes L0190 in order to obtain higher No-Fault Benefits.

(iii)   Insured JS was purportedly involved in a motor vehicle accident on January 31, 2024. Thereafter, Rosarion of KV PC issued a prescription to JS for, among other things, an "L0190 Lumbar Cushion". However, HCPCS L0190 corresponds to a Cervical Collar, not a Lumbar Cushion. Despite the inconsistency, Advanced Med Supplies billed GEICO under HCPCS Codes L0190 in order to obtain higher No-Fault Benefits.

(iv)    Insured EB was purportedly involved in a motor vehicle accident on May 18, 2024. Thereafter, NP David of KV PC issued a prescription to EB for, among other things, an (i) "L0627 Lumbar Cushion", and an (ii) an "E0762 T.E.N.S. Unit". However, HCPCS L0627 corresponds to a custom fit Lumbar Orthosis, not a Lumbar Cushion, and HCPCS E0762 corresponds to a TEJSD, not a TENS Unit. Despite the inconsistency, Advanced Med Supplies billed GEICO under HCPCS Codes L0627 and E0762 in order to obtain higher No-Fault Benefits.

(v)     Insured AG was purportedly involved in a motor vehicle accident on October 18, 2024. Thereafter, NP Khan of KV PC issued a prescription to AG for, among other things, an "E0762 EMS Unit". However, HCPCS E0762 corresponds to a TEJSD, not an EMS Unit. Despite the inconsistency, Advanced Med Supplies billed GEICO under HCPCS Codes E0762 in order to obtain higher No-Fault Benefits.

(vi)    Insured MC was purportedly involved in a motor vehicle accident on April

27, 2024. Thereafter, NP David of KV PC issued a prescription to MC for, among other things, an (i) "L0627 Lumbar Cushion", and an (ii) an "E0762 EMS Unit". However, HCPCS L0627 corresponds to a custom fit Lumbar Orthosis, not a Lumbar Cushion, and HCPCS E0762 corresponds to a TEJSD, not an EMS Unit. Despite the inconsistency, Advanced Med Supplies billed GEICO under HCPCS Codes L0627 and E0762 in order to obtain higher No-Fault Benefits.

(vii)   Insured RH was purportedly involved in a motor vehicle accident on November 22, 2024. Thereafter, Shan Shan Chen, NP ("NP Chen") of KV PC issued a prescription to RH for, among other things, an "E0762 EMS Unit". However, HCPCS E0762 corresponds to a TEJSD, not a TENS Unit. Despite the inconsistency, Advanced Med Supplies billed GEICO under HCPCS Code E0762 in order to obtain higher No-Fault Benefits.

(viii)  Insured HA was purportedly involved in a motor vehicle accident on July 4, 2023. Thereafter, NP David of KV PC issued a prescription to HA for, among other things, a "L0190 Lumbar Cushion". However, HCPCS L0190 corresponds to a Cervical Collar, not a Lumbar Cushion. Despite the inconsistency, Advanced Med Supplies billed GEICO under HCPCS Codes L0190 in order to obtain higher No-Fault Benefits.

(ix)    Insured KR was purportedly involved in a motor vehicle accident on May 31, 2024. Thereafter, Vora of KV PC issued a prescription to KR for, among other things, an (i) "L0627 Lumbar Cushion", and an (ii) an "E0762 EMS Unit". However, HCPCS L0627 corresponds to a custom fit Lumbar Orthosis, not a Lumbar Cushion, and HCPCS E0762 corresponds to a TEJSD, not an EMS Unit. Despite the inconsistency, Advanced Med Supplies billed GEICO under HCPCS Codes L0627 and E0762 in order to obtain higher No-Fault Benefits.

(x)     Insured JS was purportedly involved in a motor vehicle accident on May 18, 2024. Thereafter, NP David of KV PC issued a prescription to JS for, among other things, an (i) "L0627 Lumbar Cushion", and an (ii) an "E0762 T.E.N.S. Unit". However, HCPCS L0627 corresponds to a custom fit Lumbar Orthosis, not a Lumbar Cushion, and HCPCS E0762 corresponds to a TEJSD, not a TENS Unit. Despite the inconsistency, Advanced Med Supplies billed GEICO under HCPCS Codes L0627 and E0762 in order to obtain higher No-Fault Benefits.

140.    These are only representative examples.

141.    Notably, a TEJSD performs an entirely different function than an EMS Unit or a T.E.N.S. Unit. Specifically, an EMS Unit is used to provide muscle stimulation to decrease muscle spasms or promote muscle growth, a T.E.N.S. Unit provides nerve stimulation to assist with pain

management, and a TEJSD is intended to relieve joint pain associated with arthritis.

142.    Further, EMS Units are Non-Fee Schedule items appropriately billed under HCPCS E0745. DME Defendants purposefully represented that they provided items under HCPCS Codes E0762 in order to inflate their charges and circumvent having to demonstrate their true acquisition costs or the cost to the general public for items.

143.    In virtually all of the claims for Fraudulent Equipment identified in Exhibit "1" that are based upon vague and generic language in prescriptions provided by the Referring Providers, the DME Defendants decided the unique type of Fraudulent Equipment to purportedly provide Insureds without any legal authority to do so or any clarification from the prescribing healthcare provider.

**D.    The DME Defendants' Fraudulent Misrepresentation of the DME and OD Purportedly Dispensed**

144.    In addition to obtaining medically unnecessary prescriptions based upon predetermined fraudulent protocols, collusive arrangements with the John Doe Defendants and dispensing the Fraudulent Equipment without a licensed healthcare provider determining the specific DME/OD was medically necessary, the DME Defendants submitted bills to GEICO that misrepresented the DME/OD provided to the Insureds – to the extent that any DME/OD was actually provided.

145.    One way in which the DME Defendants submitted bills to GEICO containing misrepresentations involved the type of Fraudulent Equipment provided to Insureds, to the extent any Fraudulent Equipment was provided, and that the Fraudulent Equipment matched the HCPCS Codes identified in the bills to GEICO, when in fact they did not.

146.    When the DME Defendants submitted bills to GEICO and other New York automobile insurers, they represented that the Fraudulent Equipment was not only provided to the

Insureds and that the HCPCS codes used on the bills properly described the type of Fraudulent
Equipment that was provided to the Insureds.

147.    The Medicaid Fee Schedule and WC DME Fee Schedule specifically defines the
requirements for each HCPCS Code to bill for DME and/or OD.

148.    Additionally, Palmetto provides specific characteristics and requirements that
DME and OD must meet in order to qualify for reimbursement under a specific HCPCS Code for
both Fee Schedule items and Non-Fee Schedule items.

149.    By submitting bills to GEICO containing specific HCPCS Codes, the DME
Defendants specifically represented that the Fraudulent Equipment they purportedly provided to
Insureds appropriately corresponded to the HCPCS Codes contained within each bill.

150.    However, in many of the claims for Fraudulent Equipment identified in Exhibit "1",
when the DME Defendants submitted bills to GEICO, they fraudulently represented to GEICO
that the HCPCS codes used to bill GEICO were accurate and appropriate for the Fraudulent
Equipment purportedly provided to the Insureds – to the extent that any Fraudulent Equipment
was actually provided.

151.    For example, the DME Defendants submitted bills to GEICO that fraudulently
misrepresented the type of Fraudulent Equipment that they purportedly provided by billing GEICO
for "custom fitted" pieces when the Fraudulent Equipment was not customized at all – to the extent
that Fraudulent Equipment was actually provided.

152.    As identified in the claims contained within Exhibit "1", the DME Defendants often
billed GEICO for Fraudulent Equipment that was purportedly customized for each Insured.  Each
HCPCS Code, as defined either by the applicable fee schedule or Palmetto, will specify whether
the specific item provided to a patient is either "off-the-shelf" or specifically "custom-fitted" for

that individual patient.

153.    In order to help clarify the term "custom-fitted", Palmetto defined a custom-fitted orthotic as something that "requires more than minimal self-adjustment at the time of delivery in order to provide an individualized fit, i.e., the item must be trimmed, bent, molded (with or without heat), or otherwise modified resulting in alterations beyond minimal self-adjustment."  See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

154.    One of the key factors in identifying a "custom-fitted" orthotic is whether the item requires "minimal self-adjustment" or "substantial modification."  Minimum self-adjustment, which for an off-the-shelf orthotic means adjustment that the "beneficiary, caretaker for the beneficiary, or supplier of the device can perform and that does not require the services of a certified orthotist (that is, an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification) or an individual who has specialized training.  For example, adjustment of straps and closures, bending or trimming for final fit or comfort (not all-inclusive) falls into this category."  See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

155.    By contrast, a substantial modification, which is required for a custom-fitted orthotic, is defined as "changes made to achieve an individualized fit of the item that requires the expertise of a certified orthotist or an individual who has equivalent specialized training in the provision of orthotics such as a physician, treating practitioner, an occupational therapist, or physical therapist in compliance with all applicable Federal and State licensure and regulatory requirements.  A certified orthotist is defined as an individual who is certified by the American

Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

156.    As shown in the claims identified within Exhibit "1", the DME Defendants often billed for Fraudulent Equipment that was purportedly "custom-fitted" for each Insured when – and to the extent that Fraudulent Equipment was actually provided – the items were never custom fitted, as that term is defined by Palmetto.

157.    Based upon the prescriptions allegedly issued by the Referring Providers, the DME Defendants submitted numerous bills to GEICO for customized OD, including: (i) lumbar orthotics under HCPCS Code L0627 with a charge of $322.98; (ii) lumbar orthotics under HCPCS Code L0631, typically with a charge of $806.64; (iii) lumbar orthotics under HCPCS Code L0637, typically with a charge of $844.13; (iv) cervical collars under HCPCS Code L0190, typically with c charge of $311.75; (v) knee orthotics under HCPCS Code L1832, typically with a charge of $607.55; and (vi) shoulder orthotics under HCPCS Code L3671 with a charge of $690.23 or $766.12.

158.    The products assigned to HCPCS Codes L0627, L0631, L0637, L0190, L1832, and L3961 are types of orthoses that are customized to fit a particular patient by an individual with expertise, not the prefabricated, off-the-shelf products that could be adjusted by the patients (by simply tightening the straps) and which were dispensed by the DME Defendants.

159.    Instead, to the extent that the DME Defendants provided any Fraudulent Equipment billed to GEICO as custom-fitted OD, including the charges for HCPCS Codes L0627, L0631, L0637, L0190, L1832, and L3961 the Fraudulent Equipment was provided without taking any action to custom-fit the OD to the Insureds. To the extent that the DME Defendants attempted to

make any adjustments to the DME received by Insureds identified in Exhibit "1", the DME Defendants only provided minimal self-adjustment, as defined by Palmetto, which only supports charges for off-the-shelf items.

160.    Further illustrative of the fact that the DME Defendants misrepresented that they custom-fitted OD purportedly provided to Insureds and billed to GEICO, Elkhettab is not a certified orthotist and did not complete sufficient training to become a certified orthotist.

161.    In addition to billing for Fraudulent Equipment and falsely representing that the DME Defendants provided Insureds with customized OD, the DME Defendants submitted bills to GEICO that fraudulently inflated the reimbursement rate for the Fraudulent Equipment purportedly provided to the Insureds, to the extent that any DME was actually provided.

162.    For example, when DME Defendants submitted bills to GEICO for Non-Fee Schedule items, namely exercise equipment dispensed and billed for under HCPCS A9300, DME Defendants requested reimbursement rates that were unique and purportedly based upon the specific Fraudulent Equipment purportedly provided to Insureds.

163.    As indicated above, under the No-Fault Laws, Non-Fee Schedule items are reimbursable as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

164.    By submitting bills to GEICO for Non-Fee Schedule items, DME Defendants fraudulently represented that they requested permissible reimbursement amounts that were calculated as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the specific item.

165.    Instead, the DME Defendants submitted bills to GEICO with charges that significantly inflated the permissible reimbursement amount of Non-Fee Schedule items in order

to maximize the amount of No-Fault Benefits they were able to obtain from GEICO and other automobile insurers.

166.    The DME Defendants were able to perpetrate this scheme to fraudulently overcharge Non-Fee Schedule items by providing Insureds – to the extent they actually provided any Fraudulent Equipment – with low-cost and low-quality Fraudulent Equipment for which the acquisition cost was low.

167.    When the DME Defendants submitted bills to GEICO seeking No-Fault Benefits for Non-Fee Schedule items, the charges fraudulently misrepresented that they were calculated based on Defendants' acquisition cost for purportedly high-quality items. In actuality, DME Defendants' legitimate acquisition costs were for the low-quality items and, therefore, significantly less.

168.    Pursuant to the scheme designed to maximize their profits, the DME Defendants purposefully attempted to conceal their efforts to overcharge GEICO for Non-Fee Schedule items by never submitting a copy of their acquisition invoices in conjunction with their bills.

169.    The DME Defendants did not include invoices showing their legitimate cost to acquire the low-cost and low-quality Non-Fee Schedule items with the bills submitted to GEICO because the invoices would have shown that the permissible reimbursement amounts were significantly less than the charges listed in the bills.

170.    As part of this scheme, the charges submitted to GEICO for Non-Fee Schedule items identified in Exhibits "1" virtually always misrepresented the permissible reimbursement amount.

171.    The DME Defendants' misrepresentations regarding Non-Fee Schedule items inflated the charges submitted to GEICO and resulted in the DME Defendants obtaining payment

from GEICO under the New York "No-Fault" laws to which the DME Defendants were never entitled.

**E.     The Fraudulent Billing the DME Defendants Submitted or Caused to be Submitted to GEICO**

172.    To support their fraudulent charges, the DME Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms and/or treatment reports to GEICO through and in the name of Advanced Med Supplies, seeking payment for the Fraudulent Equipment.

173.    The NF-3 forms, HCFA-1500 forms, and treatment reports that the DME Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the DME Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and/or OD and therefore were entitled to receive No-Fault Benefits. In fact, the DME Defendants were not entitled to receive No-Fault Benefits because, to the extent that the DME Defendants provided any Fraudulent Equipment, it was pursuant to a fraudulent scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the DME Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols.

(ii)    The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the DME Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and/or OD and therefore were entitled to receive No-Fault Benefits. In fact, the DME Defendants were not entitled to receive No-Fault Benefits because, to the extent that the DME Defendants provided any Fraudulent Equipment, it was pursuant to a fraudulent scheme that included dispensing Fraudulent Equipment (a) based on prescriptions secured through collusive arrangements with the John Doe Defendants, and (b) based on prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures.

(iii)    The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the DME Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and/or OD and therefore were entitled to receive No-Fault Benefits.  In fact, the DME Defendants were not entitled to receive No-Fault Benefits because, to the extent that the DME Defendants provided any Fraudulent Equipment, it was based on decisions made by laypersons, not based upon lawful prescriptions from licensed healthcare providers for medically necessary items.

(iv)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly represented to GEICO that the DME Defendants provided Fraudulent Equipment that directly corresponded to the HCPCS Codes contained within each form and/or accurately reflected an amount less than or equal to the maximum reimbursement amount permitted under the No-Fault Laws and therefore were entitled to receive No-Fault Benefits.  In fact, the DME Defendants were not entitled to receive No-Fault Benefits because – to the extent that the DME Defendants provided any Fraudulent Equipment to the Insureds – the Fraudulent Equipment often did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms and HCFA-1500 forms and/or grossly inflated the reimbursement rate permitted under the No-Fault Laws to obtain significantly higher than the permitted maximum reimbursement amount.

**F.    The DME Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

174.    The DME Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of DME and OD to Insureds, and their actual submission of charges to GEICO.

175.    To induce GEICO to promptly pay the charges for Fraudulent Equipment, the DME Defendants have gone to great lengths to systematically conceal their fraud.

176.    Specifically, the DME Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the provision of the Fraudulent Equipment was pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants, including others not presently known (i.e. the

John Doe Defendants), without regard for genuine patient care.

177. Additionally, the DME Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the provision of the Fraudulent Equipment was pursuant to an insurance fraud scheme, which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements, and were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures.

178. Furthermore, the DME Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the provision of the Fraudulent Equipment dispensed was pursuant to an insurance fraud scheme in which decisions were made by laypersons, without legal authority to issue a prescription, and not by an actual healthcare provider.

179. In addition, the DME Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by the Defendants to GEICO did not accurately reflect the type of Fraudulent Equipment purportedly provided to the insureds and/or the charges to GEICO for Non-Fee Schedule Fraudulent Equipment were not less than or equal to the maximum permissible reimbursement amount for the DME/OD dispensed.

180. The billing and supporting documentation submitted by the DME Defendants, when viewed in isolation, did not reveal its fraudulent nature.

181. The DME Defendants hired law firms to pursue collection of the charges associated with the Fraudulent Equipment from GEICO and other automobile insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

182.    The DME Defendants' collection efforts through the filing and prosecution of numerous separate No-Fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme, since they know it is impractical for an arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address DME Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area. The purpose of the mass filings of no-fault collection proceedings is to obtain adjudication on the fraudulent billing while obfuscating the fraudulent activity and further perpetuating the RICO enterprises.

183.    In fact, DME Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that the DME Defendants have been engaged in widespread fraud.

184.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to, and did cause GEICO to rely upon them.  As a result, GEICO incurred damages of more than $600,000.00 based upon the fraudulent charges representing payments made by GEICO to DME Defendants.

185.    Based upon the DME Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against Advanced Med Supplies**
**(Declaratory Judgment Under 28 U.S.C. § 2201)**

186.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

187.    There is an actual case in controversy regarding more than $700,000.00 in fraudulent pending billing that has been submitted to GEICO in the name of Advanced Med Supplies.

188.    Advanced Med Supplies has no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were based not upon medical necessity but were submitted as part of an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants, including others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care.

189.    Advanced Med Supplies has no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were pursuant to an insurance fraud scheme, which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements, and were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures.

190.    Advanced Med Supplies no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Equipment purportedly provided by Advanced Med Supplies purportedly to Insureds was a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions.

191.     Advanced Med Supplies no right to receive payment for any pending bills submitted to GEICO because – to the extent Advanced Med Supplies actually provided any Fraudulent Equipment – Advanced Med Supplies fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds.

192.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Advanced Med Supplies have no right to receive payment for any pending bills submitted to GEICO.

**SECOND CAUSE OF ACTION**
**Against Elkhettab**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

193.     GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

194.     Advanced Med Supplies is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

195.     Elkhettab knowingly conducted and/or participated, directly or indirectly, in the conduct of Advanced Med Supplies' affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than two years seeking payments that Advanced Med Supplies was not eligible to receive under the New York No-Fault Laws because: (i) the bills submitted to GEICO for the provision Fraudulent Equipment were based not upon medical necessity but were submitted pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the DME Defendants and others not presently known, without

regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (ii) the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants, and based on prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) the Fraudulent Equipment was dispensed pursuant to decisions by laypersons who are not legally authorized to prescribe DME and/or OD; (iv) to the extent Advanced Med Supplies actually provided any Fraudulent Equipment, Advanced Med Supplies fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds; and (v) to the extent Advanced Med Supplies actually provided Non-Fee Schedule Fraudulent Equipment, the bills to GEICO fraudulently mischaracterized the permissible reimbursement amount for the Fraudulent Equipment. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

196.    Advanced Med Supplies' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Elkhettab operates Advanced Med Supplies, insofar as Advanced Med Supplies is not engaged as a legitimate supplier of DME and/or OD, and therefore, acts of mail fraud are essential in order for Advanced Med Supplies to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Elkhettab continues to submit and attempt collection on the fraudulent billing submitted by Advanced Med Supplies to the present day.

197.    Advanced Med Supplies is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Advanced Med Supplies in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

198.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $600,000.00 pursuant to the fraudulent bills submitted through Advanced Med Supplies.

199.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Elkhettab and John Doe Defendants "1" - "10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

200.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

201.    Advanced Med Supplies is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

202.    Elkhettab and John Doe Defendants "1" - "10" are owners of, employed by, or associated with the Advanced Med Supplies enterprise.

203.    Elkhettab and John Doe Defendants "1" - "10" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Advanced Med Supplies' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to

submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than two years seeking payments that Advanced Med Supplies was not eligible to receive under the New York No-Fault Laws because: (i) the bills submitted to GEICO for the provision Fraudulent Equipment were based not upon medical necessity but were submitted pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the DME Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (ii) the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants, and based on prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) the Fraudulent Equipment was dispensed pursuant to decisions by laypersons who are not legally authorized to prescribe DME and/or OD; (iv) to the extent Advanced Med Supplies actually provided any Fraudulent Equipment, Advanced Med Supplies fraudulently misrepresented the type of Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds; and (v) to the extent Advanced Med Supplies actually provided Non-Fee Schedule Fraudulent Equipment, the bills to GEICO fraudulently mischaracterized the permissible reimbursement amount for the Fraudulent Equipment. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

204.    Elkhettab and John Doe Defendants "1" - "10" knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

205.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $600,000.00 pursuant to the fraudulent bills submitted through Advanced Med Supplies.

206.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Elkhettab and Advanced Med Supplies**
**(Common Law Fraud)**

207.    GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

208.    Advanced Med Supplies and Elkhettab intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for Fraudulent Equipment.

209.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the Fraudulent Equipment that was dispensed was for reasonable and medically necessary DME and/or OD when in fact it was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and

prescribed pursuant to predetermined fraudulent protocols, (ii) in every claim, that the Fraudulent Equipment dispensed was pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants, and based on prescriptions that were otherwise illegitimate because they contained photocopied or otherwise duplicated signatures; (iii) in many claims, that Fraudulent Equipment was issued based upon legitimate prescriptions by licensed healthcare providers when the Fraudulent Equipment was provided, to the extent any Fraudulent Equipment was provided, pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (iv) in many claims, that Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment provided, to the extent that any Fraudulent Equipment was actually provided, did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (v) in many claims, that charges for the Fraudulent Equipment provided to the Insureds accurately reflected the maximum reimbursement amount permitted under the No-Fault Laws when the Fraudulent Equipment billed, to the extent that any Fraudulent Equipment was actually provided, grossly misrepresented the permissible reimbursement amount.

210.    Elkhettab and Advanced Med Supplies intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Advanced Med Supplies that were not compensable under the No-Fault Laws.

211.    GEICO has been injured in its business and property by reasons of the above-described conduct in that it has paid at least $600,000.00 pursuant to the fraudulent bills submitted by the DME Defendants through Advanced Med Supplies.

212.     The DME Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

213.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other further relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Advanced Med Supplies and Elkhettab**
**(Unjust Enrichment)**

214.     GEICO repeats and realleges each and every allegation set forth above as if fully set forth at length herein.

215.     As set forth above, Advanced Med Supplies and Elkhettab engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

216.     When GEICO paid the bills and charges submitted by or on behalf of Advanced Med Supplies for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of Advanced Med Supplies and Elkhettab.

217.     Advanced Med Supplies and Elkhettab have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful and unjust billing scheme.

218.     Retention of GEICO's payments by Advanced Med Supplies and Elkhettab violates fundamental principles of justice, equity, and good conscience.

219.     By reason of the above, Advanced Med Supplies and Elkhettab have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $600,000.00.

## JURY DEMAND

220.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgement be entered in their favor and against the Defendants as follows:

A.    On the First Cause of Action against Advanced Med Supplies, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Advanced Med Supplies has no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Elkhettab, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $600,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Elkhettab and the John Doe Defendants, more than $600,000.00 in compensatory damages, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against Advanced Med Supplies and Elkhettab, more than $600,000.00 in compensatory damages, punitive damages, plus costs and interest, and such other and further relief as this Court deems just and proper; and

E.    On the Fifth Cause of Action against Advanced Med Supplies and Elkhettab, more than $600,000.00 in compensatory damages, plus costs and interest, and such other and further relief as this Court deems just and proper.

Dated: November 3, 2025
      Uniondale, New York

                          RIVKIN RADLER LLP

                          By: *s/ Barry I. Levy*
                                Barry I. Levy
                                Michael Vanunu
                                Joanna Rosenblatt
                        926 RXR Plaza
                        Uniondale, New York 11556
                        (516) 357-3000

                        *Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*